NOT DESIGNATED FOR PUBLICATION

No. 112,728

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LARRY GENE SMITH, JR.,
*Appellant.*

MEMORANDUM OPINION

Appeal from Saline District Court; PATRICK H. THOMPSON, judge. Opinion filed June 17, 2016. Affirmed.

*Caroline M. Zuschek*, of Kansas Appellate Defender Office, for appellant.

*Amy Norton*, assistant county attorney, and *Derek Schmidt,* attorney general, for appellee.

Before HILL, P.J., STANDRIDGE and ATCHESON, JJ.

*Per Curiam:* Claiming instructional errors and an error in excluding evidence, Larry Gene Smith, Jr., appeals his conviction for battery on a corrections officer. Because none of his claims are reversible, we affirm.

*Smith refused to leave his cell and a struggle ensued.*

In August 2010, Corporal Travis Henry heard pounding sounds coming from Smith's cell in the Saline County Jail. Henry and Deputy Brenda Darr went to Smith's

1

cell. When they arrived, Smith said he wanted to speak to the FBI. Henry had the door to Smith's cell opened. Smith immediately pulled the cell door shut. Henry had the door opened again. He told Smith to sit on his bed. Henry asked Smith why he was kicking the door and whether he was trying to hurt himself. Smith said he could do what he wanted. Henry described Smith's demeanor as agitated. Henry told Smith to quit kicking his door or he would be charged with damage to county property. Smith asked if Henry was threatening him. Henry said "no" and told him he would be taken to booking for closer monitoring if he did not stop kicking the door. Smith said he was not going to stop kicking the door. Henry told him to stand and pack up his belongings to move to booking. Smith refused.

Deputy Christopher Milleson and Deputy Amber Black arrived in response to the commotion. Milleson and Henry entered Smith's cell. Henry grabbed Smith's arm to help him stand up so he could be taken to booking. Smith then began flailing, kicking, and punching. Smith yelled that he was not going to do what they asked him. Milleson testified that Smith hit him in the chest three or four times before Milleson gained control of Smith's arms.

Henry grabbed Smith's left arm and Milleson went to Smith's right side. Smith rolled onto his stomach, trapping Milleson's arm beneath Smith's body. Smith admitted he was resisting the officers. But he said he was not swinging or trying to cause a ruckus. Smith testified that Milleson put his knee into Smith's back. Smith testified that someone then struck him on the back of his head. He thought it was a ring or a knuckle, but he did not know because he was facing down. Smith said he could see the blood spraying onto his table and wall out of the sides of his eyes. Smith did not yell out that he was bleeding.

Milleson testified that Smith bit his hand hard enough to break the skin. The contact lasted "multiple seconds." Milleson yelled, "[H]e's biting me." Milleson pulled Smith's head back and his hand came up with it. Milleson told Smith to stop biting him.

Then, Henry pushed on a pressure point where the jaw and ear meet and Milleson pulled Smith's head up with his other hand to get Smith to release Milleson's hand. Milleson testified that his hand was bleeding. Smith denied intentionally biting Milleson's hand, but he admitted it was possible that he made incidental contact with Milleson's hand. Smith continued to flail and kick, despite the officer's verbal commands to stop resisting. Smith testified that he screamed that he was not suicidal and not trying to resist. He testified that he was not trying to cause any harm, but rather he was trying to prove a point.

The officers moved Smith from the bed to the floor of the cell where they could apply handcuffs and legcuffs. Smith was still flailing and kicking. Smith was advised multiple times that the deputies would use a Taser if he did not stop. Smith continued to resist, so Henry tasered him. Smith continued to kick and flail. Henry tasered Smith again, this time by a "drive-stun," where the end of the Taser gun makes contact with the skin. The officers then were finally able to handcuff Smith. They carried him to a cell in booking. The struggle lasted about 5 minutes.

Henry examined Smith for injuries and found a cut on the back of his head; the Taser probes were still attached to Smith. Nurse Brenda Herring was called. The nurse found a 1/4- to 1/2-inch laceration on his head that was not bleeding, but there was fresh blood in his hair. She cleaned the wound, but it did not need to be bandaged and Smith did not need further medical attention. The nurse testified that scalp wounds are highly vascular, meaning they bleed easily. She testified that he could not have gotten that wound from a knuckle, fist, or ring. The wound was consistent with injuries from direct impact to an object—"you have to hit with impact to make that kind of an injury," such as the corner of a desk or a metal bed. Henry testified that afterward he noticed some blood in Smith's jail cell; he recalled a 2-inch puddle of blood. Henry and the nurse also identified a bite mark on Milleson's hand. Milleson also testified that his bicep was bruised sometime during the struggle.

*The State charged Smith with battery on a corrections officer.*

Smith was charged with one count of battery on a corrections officer, a severity level 5 person felony, for his contact with Milleson. Smith was convicted by a jury. He moved for a dispositional departure to probation, which was granted. He was sentenced to 36 months' probation with an underlying 52-month prison sentence.

Smith alleges three errors. First, the trial court erred by refusing to instruct the jury on self-defense. Second, the court erred by failing to give a unanimity instruction. Finally, the court erred when it excluded some blood-splattered papers from admission into evidence. We will take up his issues in that order.

*No evidence in the record supports giving a self-defense instruction.*

When Smith asked the trial court to instruct the jury on self-defense, the State objected and the court agreed with the State. In the court's view, giving the instruction would have been inconsistent with the defense:

> "Well, the Court listened carefully to Mr. Smith's testimony. His testimony was consistent both on direct and on cross-examination that any contact was not intentional or—I believe Mr. Smith's word was 'miscalculation' when testifying about the bite. That he was not swinging, and he wasn't causing a ruckus, that he was saying, 'I'm not trying to resist, I'm not suicidal.' That he was not intentionally striking the officers. So the claim of self-defense would not be consistent with the defendant's own testimony or with the testimony of the officers in this matter.
>
> "And so, therefore, the Court's going to deny the self-defense instruction."

Smith argues that the trial court erred because defendants have a due process right to allege contradictory defense theories as long as any evidence supports them.

The test we use to address these questions is well established:

"'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).' [Citation omitted.]" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

Our research reveals that another panel of this court has, in Smith's prior conviction, resolved an argument virtually identical to that raised by Smith here. See *State v. Smith*, No. 108,408, 2014 WL 642037 (Kan. App.), *rev. denied* 301 Kan. 1051 (2014). In that case, Smith was also being held at the Saline County Jail. Deputies went to his cell to investigate complaints of an odor. They asked Smith to clean his cell, but he refused. Deputies attempted to escort him to booking so his cell could be cleaned. Smith became angry and agitated. He swung his arm to strike one of the deputies and kicked several times, hitting another officer. Smith denied swinging at or kicking the deputies. He claimed he might have bumped into one of the deputies and slipped or tripped. Smith requested a self-defense instruction, which the district court denied. The panel stated:

"Certainly, self-defense can be a defense against a charge of intentional battery. [Citation omitted.] But self-defense is not generally available against a uniformed law enforcement officer—or a correctional officer in this case. [Citation omitted.]

"Accordingly, Smith was only entitled to his requested instruction on self-defense if there was evidence, viewed in the light most favorable to Smith, 'sufficient to justify a rational factfinder finding in accordance with [his] theory.' [Citation omitted.] In other words, Smith was entitled to use force against the correctional officers if he

5

reasonably believed that force was necessary to defend against the officers' 'imminent use of *unlawful* force.' (Emphasis added.) K.S.A. 2011 Supp. 21-5222. 'A reasonable belief implies both an honest belief and the existence of fact which would persuade a reasonable person to that belief.' [Citation omitted.]

"At trial, Smith testified that he did not fight or use intentional force against the officers. Considering his own testimony that he did not fight or otherwise use force to defend himself, it is difficult to imagine that a rational factfinder could conclude that Smith was defending himself. We do, however, recognize that a self-defense instruction may be appropriate under some circumstances even when it is inconsistent with a defendant's own testimony. [Citation omitted.] Nonetheless, in this case, there is no evidence in the record to support a claim that Smith acted to defend himself against unlawful force being used by the officers." 2014 WL 642037, at *2-3.

Here, Smith was likewise convicted of intentional battery. See K.S.A. 21-3413(a)(3)(D). He similarly claimed that any contact between his mouth and Milleson's hand was unintentional—a "miscalculation." But Smith claims his head wound in this case was evidence of unlawful force used by the officers. He claims that the record indicates he bit Milleson's hand after his head had been injured. Smith also complains that the officers used force to wrestle him to the ground before trying other techniques and that the officers "drive-stunned" him, which is more painful than other methods of using a Taser.

Indeed, a defendant is entitled to jury instructions on the law applicable to all the defense theories for which there is supporting evidence, even if the evidence is only the defendant's testimony. However, there must be evidence which, when viewed in the light most favorable to the defendant, is sufficient for a rational factfinder to find in accordance with the defendant's theory. *State v. Salary*, 301 Kan. 586, 593, 343 P.3d 1165 (2015).

6

To justify a self-defense instruction, the defendant must present some evidence to support each prong of a two-prong self-defense test. First, the defendant must show he sincerely and honestly believed it was necessary to use force to defend himself. Second, the defendant must show that a reasonable person in his circumstances would have perceived self-defense as necessary. *State v. Tyler*, 251 Kan. 616, 625, 840 P.2d 413 (1992); *State v. Lutter*, 27 Kan. App. 2d 858, 860, 10 P.3d 16, *rev. denied* 270 Kan. 902 (2000).

Generally, self-defense is not available for resisting an identified, uniformed law enforcement officer. *City of Wichita v. Cook*, 32 Kan. App. 2d 798, 801, 89 P.3d 934 (2004). But an officer's use of excessive force invokes a right to self-defense. *State v. Heiskell*, 8 Kan. App. 2d 667, 672, 666 P.2d 207 (1983). Use of force by a law enforcement officer is not excessive even if the officer used more force than actually required, unless the force used was an unreasonable amount of force or used wantonly and maliciously to injure the person. See *Dauffenbach v. City of Wichita*, 8 Kan. App. 2d 303, 308, 657 P.2d 582, *aff'd* 233 Kan. 108, 667 P.2d 380 (1983).

Here, Smith began a physical confrontation with the deputies who were attempting to do their job. Smith presented no evidence that he bit Milleson because he sincerely and honestly believed it was necessary to defend himself. To the contrary, Smith's testimony was that the contact was a miscalculation. He did not express fear for his physical well-being. Further, no evidence was presented that a reasonable person would have perceived self-defense was necessary in this situation where the deputies testified that they asked Smith to stop resisting and he had opportunities to comply with this request. Moreover, the fact that Smith sustained a laceration to his head was not evidence that the deputies used unlawful or excessive force because Smith could not say what caused the head injury—he merely speculated that he was punched. None of the deputies saw Smith get hit on the head. The nurse testified that he could not have gotten that wound from a

7

knuckle, fist, or ring. There was also no evidence that the deputies used unlawful force by moving Smith to the ground or by using a Taser.

Smith was also not entitled to a self-defense instruction because he initially provoked the use of force by flailing, kicking, and punching at the deputies who were lawfully attempting to move him to another cell. Under K.S.A. 2010 Supp. 21-3214(c), a person that initially provokes the use of force against him is not entitled to use force in defense unless:

> "(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and such person has exhausted every reasonable means to escape such danger other than the use of deadly force; or

> "(2) In good faith, such person withdraws from physical contact with the assailant and indicates clearly to the assailant that such person desires to withdraw and terminate the use of such force, but the assailant continues or resumes the use of such force."

Neither exception applies here. Smith could have merely stopped resisting the officers and ended the struggle. But Smith continued resisting even after he was warned that he would be tasered if he did not stop. He did not stop resisting until after he was tasered twice.

Smith contends that a defendant is entitled to present multiple inconsistent defenses. True, a defendant need not rely on his own testimony to merit a self-defense instruction. "A defendant is entitled to a self-defense instruction if there is any evidence from which a jury could conclude that, despite his denial, a defendant committed an act but did so in self-defense." *Heiskell*, 8 Kan. App. 2d at 675. But Smith did not present evidence sufficient for a jury to conclude that he acted in self-defense. And there was no evidence that any of the deputies intentionally hit Smith on the head, that he honestly

8

believed he needed to use force in his defense, or that a reasonable person would have thought force was necessary under the circumstances.

In *Heiskell*, police officers testified that they pulled over the car the defendant was riding in. The defendant got out of the car and started barraging the officers with verbal abuse and threats. One officer arrested the defendant for disorderly conduct. The defendant refused to put his hands on the car and instead placed a headlock on an officer. The defendant was charged with battery on a law enforcement officer for this incident. The defendant and three other defense witnesses testified, in contrast, that as soon as the defendant got out of the car, one officer told him that he was under arrest. The defendant walked toward the officers with his hands in the air, stating, "'You can arrest me.'" 8 Kan. App. 2d at 669. But an officer grabbed the back of the defendant's neck and pushed his head into the car windshield. Other officers hit him with their flashlights four to six times. The defendant testified that he did not resist. He denied putting the officer in a headlock. He went to the hospital the next day and was treated for bruised ribs, lacerations to his back, and an injured thumb. The court held that because a jury could have believed both defendant's testimony about the use of excessive force and the officer's testimony about the headlock, it was error not to instruct the jury on self-defense. 8 Kan. App. 2d at 675.

This case is distinguishable. This was not a case where multiple witnesses testified that they saw officers beat Smith with no provocation and that he did not resist. Smith instigated a physical struggle with the deputies, he admitted he was resisting, and he did not see what hit his head, or what he hit his head on, during the struggle.

Smith contends that he was entitled to a self-defense instruction if "any evidence whatsoever" raised the issue. However, our Supreme Court has clarified that the evidence must be sufficient for a jury to find in accordance with the defense theory. *Salary*, 301 Kan. at 593; see *State v. Anderson*, 287 Kan. 325, 331-34, 197 P.3d 409 (2008).

9

Smith contends that the trial court violated his constitutional right to present a defense. However, a self-defense instruction was not supported by the law or the evidence and so the failure to give the instruction did not violate Smith's due process rights. See *State v. Wade*, 45 Kan. App. 2d 128, 135-36, 245 P.3d 1083 (2010).

*We find no error in the court not giving a unanimity instruction.*

In its closing, the State argued that two intentional acts supported the single battery charge: the bite to Milleson's hand and the punches to Milleson's chest. Smith did not request a unanimity instruction.

A party cannot claim error for the district court's failing to give a jury instruction unless (1) the party objects before the jury retires, stating distinctly the matter to which the party objects and the grounds for the objection; or (2) the instruction or the failure to give the instruction is clearly erroneous. *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013).

We use a two-step process in determining whether the challenged instruction was clearly erroneous. First, the court must consider whether there was any error at all by considering whether the instruction at issue was both legally and factually appropriate, employing an unlimited review of the entire record; (2) if the court finds error, it must assess whether it is firmly convinced the jury would have reached a different verdict without the error. *State v. Clay*, 300 Kan. 401, 408, 329 P.3d 484 (2014). In multiple acts cases that do not present a unified defense, *e.g.*, a general denial, the second step is met. *State v. Voyles*, 284 Kan. 239, 253, 160 P.3d 794 (2007).

Smith now claims for the first time on appeal that the jurors could have convicted him for battery on a correctional officer for different acts. Given that, he argues that it was error for the trial court not to give the jury a unanimity instruction.

10

Our Supreme Court has explained its concerns about a single charge arising from several acts:

"Under Kansas law, a jury verdict in a criminal trial must be unanimous. [Citation omitted.] Normally this requirement is satisfied if the trial court instructs the jury that its verdict must be unanimous on each separate count. However, achieving unanimity can be complicated when the State charges a defendant with a single count based on multiple acts. In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. [Citation omitted.] . . . In order to ensure jury unanimity as to the specific act for which the defendant is charged, the trial court must either require the State to elect the particular criminal act upon which it will rely for the conviction or instruct the jury that all jurors must agree that the same underlying criminal act has been proven beyond a reasonable doubt. [Citation omitted.]

"In *Voyles*, this court set out a three-part test to determine when a multiple acts situation has occurred such that the jury must agree on the same underlying criminal act. First, the court must determine if the case truly involves multiple acts, *i.e.*, whether the defendant's conduct was part of one act or represents multiple acts which are separate and distinct from each other. Second, the court must consider whether error occurred, *i.e.*, whether there was a failure by the State to elect an act or a failure by the trial court to instruct. Third, the court must determine whether the error is reversible. [Citation omitted.]" *State v. Colston*, 290 Kan. 952, 961-62, 235 P.3d 1234 (2010).

Acts are multiple acts if they are factually separate and distinct. Acts are factually separate and distinct if the acts were independent criminal acts that occurred at different times or the later act was motivated by a "fresh impulse." In addition, the following factors are considered: (1) whether the acts occurred at or near the same time; (2) whether the acts occurred at the same location; (3) whether there was a causal relationship between the acts, in particular whether there was an intervening event; and (4) whether there was a fresh impulse motivating some of the conduct. *State v. Moyer*, 302 Kan. 892, 910, 360 P.3d 384 (2015). Whether a case involves multiple acts is a question of law over which this court has unlimited review. *Colston*, 290 Kan. at 962.

11

Smith contends that the punches to Milleson's chest and the bite to Milleson's hand were separated by an intervening event—the injury to his head. He contends that his initial contact with the officer was to make a point, but the head wound created a fresh impulse to act in self-defense. He contends that some jurors could have thought that the State did not prove that he punched Milleson, but did prove that he bit Milleson's hand; while other jurors could have decided that he punched Milleson, but that he acted in self-defense when he bit Milleson. Smith also contends that hitting and biting are factually distinguishable types of physical contact. He contends that there was reversible error because he did not present a unified theory of defense.

In *State v. Staggs*, 27 Kan. App. 2d 865, 867, 9 P.3d 601 (2000), the defendant complained that the trial court failed to instruct the jurors that they must unanimously agree about which underlying act supported his charge of aggravated battery. The defendant complained that some jurors may have found that the defendant kicked the victim, while others found that he punched the victim. The defendant claimed self-defense. He admitted punching the victim, but denied kicking him. This court held:

> "[T]he evidence here supports only a brief time frame in which the aggravated battery occurred. Once defendant initiated the altercation, no break in the action of any length occurred, and the confrontation continued until defendant broke the victim's cheekbone. Simply put, the evidence established a continuous incident that simply cannot be factually separated. No 'multiple acts' instruction was necessary." 27 Kan. App. 2d at 868.

In *State v. Ultreras*, 296 Kan. 828, 831, 295 P.3d 1020 (2013), the defendant was convicted of aggravated battery for acts that occurred during a fight at a bar. The bar was owned by the defendant's father. The victim was being physically escorted out of the bar because he was underage, and a fight broke out. The defendant grabbed a metal baton and joined in the fight as it moved from inside the bar to outside the bar. The defendant claimed his aggravated battery charge was based on multiple acts because the State alleged he struck the victim while inside the bar and then again while outside the bar. He

12

claimed that a juror could have believed he acted in defense of property while inside the bar and in defense of himself or others while outside the bar. He claimed the different motivation for the second act was a fresh impulse. The court held that the acts occurred at or near the same time, at the same location, and there was a causal relationship. The acts were part of an "overall design or objective" to remove the victim from the bar. The fight was a continuing course of conduct. There was no break in the action or an intervening act. The availability of different defenses for the acts did not interrupt the continuous course of conduct. Thus, a unanimity instruction was not required. 296 Kan. at 856.

In *State v. Green*, No. 90,711, 2004 WL 1489058 (Kan. App.) (unpublished opinion), *rev. denied* 278 Kan. 849 (2004), the defendant was convicted of battery against a law enforcement officer. The defendant contended that the case involved four separate acts: grabbing and pushing the officer's hand, striking the officer's cheek with his fist, striking the officer's cheek with his elbow, and striking the officer's cheek with his elbow a second time. The court held that the defendant and the officer

> "were involved in only one relatively short, continuous incident, with no appreciable interruption. There were no 'multiple acts,' and if the State had charged Green with four separate counts of battery against a law enforcement officer based on each act that Green alleges, the issue of multiplicity could have been justly raised." 2004 WL 1489058, at *2.

The defendant's defense that there was no contact or only incidental contact was not dependent on separate acts. 2004 WL 1489058, at *2.

Here, once Smith initiated a physical struggle with the deputies to "put a point across" about not wanting to go to booking, there was no break in the action. The confrontation continued until he was tasered twice and deputies were finally able to handcuff him. It was a continuous action that was part of an overall design or objective to move Smith to a cell in booking because he refused to stop banging on his cell door. The

13

hitting and biting occurred at the same location within a short span of only 5 minutes. The laceration to Smith's head was not an intervening act, it was part of a continuous struggle of contact between the deputies and Smith. If the jury had heard evidence sufficient to warrant a self-defense instruction because of Smith's head injury, then a unanimity instruction would have been warranted. But, no evidence supported Smith's theory on appeal that he bit Milleson due to a "fresh impulse" of self-defense. Smith testified that he did not intentionally bite Milleson's hand, rather it was a miscalculation, and that he was resisting because he was trying to prove a point. There was no evidence of a fresh impulse presented at trial. Therefore, this was not a multiple acts case and failure to give a unanimity instruction was not clear error.

*There is no error in refusing to admit some papers with blood splatters on them.*

During his testimony, Smith moved to admit defense exhibits A, B, C, and D. He testified that the exhibits were pieces of paper from a notepad that was sitting on the metal table in his cell or was under him the night of the incident. He testified his blood was on the paper. He testified that he did not physically see the paper with blood splatters on them the night of the incident. He noticed them after he got his property back. The notepad was left in his cell when he was taken out that night. The deputies afterward removed his property, cleaned the cell, and returned his property approximately 24 hours to a week later in a plastic bag. Smith testified he had otherwise had the exhibits in his custody and had not shown them to anyone.

The prosecutor objected to the admission of the evidence due to lack of foundation. "I don't think we can establish that A, what's on the items, is in fact—what is, in fact, blood or Mr. Smith's blood. And I think there is a chain of custody issue with determining how those splotches actually got onto those particular items." The trial court sustained the objection.

14

As a preliminary matter, the State contends that this court cannot reach the merits of Smith's claim of error because Smith failed to include the exhibits in the record on appeal. However, the exhibits were sufficiently described such that the court can consider Smith's claim. We view this as a question of discretion for the trial court.

Smith contends that the only issue with the exhibits was chain of custody, which goes to the weight of the evidence, not its admissibility. The State contends that Smith could not testify with reasonable certainty that the paper had not been materially altered.

Establishing the chain of custody "is part of the foundation for the admission of physical evidence." *State v. Ruebke*, 240 Kan. 493, 509, 731 P.2d 842 (1987). Both parties cite *State v. Horton*, 283 Kan. 44, 62, 151 P.3d 9 (2007), which states:

> "A party offering an object into evidence must show with reasonable certainty that the object has not been materially altered since the object was taken into custody. However, the party is not required to keep the object under lock and key or continuously sealed up. The test for chain of custody is a reasonable certainty that the object has not been materially altered. Any deficiency in the chain of custody goes to the weight of the evidence rather than its admissibility. [Citation omitted.] In this case, an officer testified that the objects appeared to be the same objects that were collected in 1974. Thus, the district court properly admitted the objects from Horton's car for the jury to consider."

In *Horton*, the defendant complained that evidence seized from his car should have been suppressed because the police officer failed to individually package each item before placing them in his police car. The officer testified that the objects appeared to be the same objects that were collected from the defendant's car. Thus, the court held the district court properly admitted the objects. 283 Kan. at 62.

Here, Smith could not testify that the exhibits had not materially changed from the night of the incident because he did not notice the blood on the pieces of paper until he

15

got his belongings back from the correctional officers. None of the officers testified about the exhibits.

Moreover, any error in the exclusion of the blood-spattered paper was harmless. The erroneous exclusion of evidence is subject to review for harmless error under K.S.A. 60-261. Factors an appellate court can consider in reviewing the erroneous exclusion of evidence for harmless error include: importance of the evidence, whether the evidence was cumulative, the presence or absence of evidence corroborating or contradicting the evidence, the extent of cross-examination otherwise permitted, and the overall strength of the case. *Ultreras*, 296 Kan. 828, Syl. ¶ 11. If the error implicates a constitutional right, the effect of that error must be assessed under the constitutional harmless error standard: whether the party benefiting from the error proves beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record. *State v. Santos-Vega*, 299 Kan. 11, 24, 321 P.3d 1 (2014).

There was no reversible error.

Since we have found no trial court errors, we reject Smith's claim of cumulative error.

Affirmed.

16